MARSTILLER, J.
The Agency for Persons with Disabilities (“APD”) appeals an amended final order from the Division of Administrative Hearings sustaining Appellees’ Petition for Administrative Determination of Invalidity of Agency’s Use of an Unadopted Rule.[1] Appellees are APD clients receiving Intensive Behavioral Residential Habilitation (“IBRH”) treatment. They claimed APD was employing an unadopted rule, as opposed to certain provisions in the “Developmental Disabilities Waiver Services Coverage and Limitations Handbook” November 2010 (“Handbook”), to place IBRH recipients in less intensive treatment programs. The particular Handbook provisions are six “conditions for transition” which, when met, signify that a recipient no longer needs IBRH treatment and should be transitioned to a less intensive treatment program.
Following an evidentiary hearing, the presiding Administrative Law Judge (“ALJ”) ruled that APD must abide by the Handbook and cannot reduce an IBRH client’s level of treatment unless all six transition conditions are met. The ALJ further ruled that APD’s reliance on any other criteria to reduce services constituted use of an unadopted rule, and ordered the agency to immediately discontinue all reliance on such criteria. For the reasons discussed below, we conclude the ALJ erred, and accordingly reverse the pertinent portion of the amended final order.

I. Regulatory Background

APD’s general responsibilities concerning the Developmental Disabilities Medicaid Waiver (“DD Waiver”) are set forth in the Handbook, which is incorporated by reference into Florida Administrative Code Rule 59G-13.083. APD operates and oversees the DD Waiver.[2] ‘Waiver services shall only be provided when the ser *715 vice or item is medically necessary.”[3] “When a requested service or item is determined to be medically necessary and the service or item is covered by the waiver, it shall be approved within limits specified, in accordance with this handbook.”[4] If APD determines the requested service is not medically necessary, a Medicaid recipient may appeal the decision by requesting an administrative hearing.[5]
Under an Agency for Healthcare Administration [6] rule, a service is “medically necessary” when it meets all the following conditions:
1. Be necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain;
2. Be individualized, specific, and consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and not in excess of the patient’s needs;
3. Be consistent with generally accepted professional medical standards as determined by the Medicaid program, and not experimental or in-vestigational;
4. Be reflective of the level of service that can be safely furnished, and for which no equally effective and more conservative or less costly treatment is available statewide; and
5. Be furnished in a manner not primarily intended for the convenience of the recipient, the recipient’s caretaker, or the provider.
Fla. Admin. Code R. 59G-1.010(166)(a). Importantly, the rule further states, “The fact that a provider has prescribed, recommended, or approved medical or allied care, goods, or services does not, in itself, make such care, goods or services medically necessary or a medical necessity[.]” Fla. Admin. Code R. 59G-1.010(166)(c). The Handbook quotes these rule provisions.
IBRH is a covered DD Waiver service, the goal of which “is to prepare the person for full or partial reintegration into the community, with established behavioral repertoires[.]”[7] Thus, the Handbook instructs service providers that “[ijndividual service plans for recipients receiving [IBRH] will include a written plan to decrease services through improved behavior and when applicable, medical condition.”[8] The Handbook also tells providers that the specified “recipient characteristics and service characteristics must be met in order to receive an intense behavioral residential habilitation rate.”[9] Further, “[s]ervice authorization [via APD’s prior service authorization process] shall be based on established need and re-evaluated at least annually while the recipient is receiving the services.”[10]
As to recipient characteristics, the Handbook provides:
*716 [IBRH] is for recipients who present problems with behavior that are exceptional in intensity, duration, or frequency and that meet one or more of the following conditions.
Within the past 6-months the recipient:
1. Engaged in behavior that caused injury requiring emergency room or other inpatient care from a physician or other health care professional to self or others.
2. Engaged in a behavior that creates a life-threatening situation. Examples of these types of behavior are excessive eating or drinking, vomiting, ruminating, eating non-nutritive substances, refusing to eat, swallowing excessive amounts of air, and severe Insomnia.
3. Set a fire in or about a residence or other facility in an unauthorized receptacle or other inappropriate location.
4. Attempted suicide.
5. Intentionally caused damage to property in excess of $1,000 in value for one incident.
6. Engaged in behavior that was unable to be controlled via less restrictive means and necessitated the use of restraints, mechanically, manually or by commitment to a crisis stabilization unit, three or more times in a month or six times across the applicable six-month period.
7. Engaged in behavior that resulted in arrest and confinement.
8. Requires visual supervision during all waking hours and intervention as determined by a certified behavior analyst or licensed behavior analysis professional to prevent behaviors previously described above that were likely, given past behavior in similar situations, without such supervision.
9. Engaged in sexual behavior with any person who did not consent or is considered unable to consent to such behavior, or engaged in public displays of sexual behavior (e.g. masturbation, exposure, peeping Tom, etc.).
10. If the supervision and environment is such that the person lacks opportunity for engaging in the serious behaviors the behavior analyst providing oversight must determine that the behavior would be likely to occur at least every six months if the person is without the supervision or environment provided and document in the recipient’s records![11]
The Handbook describes IBRH service characteristics, and discusses “Special Considerations,” among which are the conditions for transitioning a recipient to less intensive treatment. The Handbook specifically states that “[t]he transition criteria for intensive residential habilitation define the conditions under which the treatment team must recommend a less structured, more open environment[J”[12] It goes on to list the following six “Conditions for transition”:
1. The behavioral excesses that made treatment necessary no longer occur in the presence of the environmental conditions that previously evoked those behaviors.
2. The behaviors do not occur as a function of new environmental conditions.
3. The behaviors intended to replace the problem behavior now reliably *717 occur in the presence of the environmental conditions that previously evoked those behaviors that previously controlled the behavioral excesses.
4. Caregivers reliably carry out the medical and behavioral strategies necessary to maintain or continue improvements in health and behavior without direct supervision from a nurse, behavior analyst or other professional care provider. The direct care providers and recipient no longer require the levels of oversight established within the exceptional services program for professional care providers including physicians, nurses, and behavior analysts.
5. Direct care providers no longer require the levels established within the exceptional services program for direct supervision. Supervision is the same as that which is typically provided in the residential setting to which the person is most likely to move.
6. The provider has determined the recommended transition levels of staff across all categories and the physical environment requirements needed for the recipient to maintain or to continue improvements.
When the conditions identified above are met, the recipient would no longer require intensive habilitation treatment. However, treatment would continue with the focus shifting to ensuring that the gains made maintain or continue to improve in settings that have more variability in the prevailing contingencies and afford greater access to unplanned, everyday encounters and untrained people.[13]

II. Analysis

Appellees’ burden of proof below was to establish, by a preponderance of the evidence, that APD relied on an unadopted rule in transitioning IBRH clients to less intensive services. See § 120.56(1)(e), Fla. Stat. On appeal, we review the ALJ’s findings of fact for competent, substantial evidence, and the conclusions of law de novo. See § 120.68(7), Fla. Stat.; Moreland v. Agency for Persons with Disabilities, 19 So.3d 1009, 1011 (Fla. 1st DCA 2009).
The gravamen of Appellees’ rule challenge was that APD moved them from IBRH to a lower level of service without first determining all six conditions for transition set forth in the Handbook were met. At the administrative hearing, APD explained through witnesses that in reviewing an IBRH client’s service level, which it must do “at least annually,” its primary consideration is whether the recipient characteristics initially justifying IBRH still exist. But the overarching determinant is medical necessity for continued IBRH. APD posited that the transition conditions in the Handbook are “considerations” in its service level review. The ALJ concluded, inter alia:
38. The [Handbook] provides for six conditions for transition. APD’s statement that the review starts with medical necessity or “need” is not found in the conditions for transition. ... Further, it may seem logical that the same characteristics used to get into the [IBRH] service are used to transition out of the [IBRH] service (number one of the six conditions to transition), but APD’s elimination of the remaining five conditions amounts to an un-promulgated rule....
*718 39. The [Handbook] language is specific: “Intensive behavioral residential habilitation is for recipients who present problems with behaviors that are exceptional in intensity duration, or frequency,” and the rule provides those characteristics. That portion of the Handbook does not equivocate, nor provide that those same characteristics shall be used to transition a client or resident to a lower level of service.
(Emphasis in original.)
The ALJ’s conclusions are inconsistent with the plain language of the Handbook, which specifically provides that “recipient characteristics ... must be met in order to receive an intense behavioral residential habilitation rate.” (Emphasis added.) As the Handbook explains, APD’s authorization for IBRH services “shall occur prior to service delivery, for new services ... and at least annually while the recipient is receiving the service.”[14] Thus, contrary to the ALJ’s conclusion, whether APD is conducting an initial review of a service request or a periodic reevaluation of services provided, authorization for IBRH rests on the existence of one or more of the requisite recipient characteristics. If, upon reevaluation, a client displays none of those characteristics, under the Handbook, APD may not authorize continued treatment at that level. In that instance, APD’s decision does not rest on an unpro-mulgated rule.
The transition conditions to which, the ALJ ruled, APD must adhere, describe the circumstances under which the treatment team must recommend less intensive ha-bilitation service for the client. Although the Handbook tells service providers that, “when the [transition] conditions ... are met, the recipient would no longer require [IBRH],” it does not prohibit less intensive treatment if all six conditions are not met.[15]
Moreover, neither does the Handbook, explicitly or implicitly, prohibit APD from denying continued authorization for IBRH until the six transition conditions are met. Rather, the Handbook states: “Waiver services shall only be provided when the service or item is medically necessary.”[16] The ALJ appears to have interpreted the statement in the Handbook, that “[intensive behavioral residential habilitation is for recipients who present problems with behaviors that are exceptional in intensity, duration, or frequency,” to mean IBRH is per se medically necessary for a client who has such behavioral problems and who exhibits at least one of the requisite recipient characteristics. But a service is only medically necessary when it meets all five criteria set forth in rule 59G-1.010(166)(a), including that it must “[b]e reflective of the level of service that can be safely furnished, and for which no equally effective and more conservative or less costly treatment is available statewide[.]” Fla. Admin. Code R. 59G-1.010(166)(a)4. The fact that a provider has prescribed a particular service or treatment does not mean the service or treatment is medically necessary. See Fla. Admin. Code R. 59G-1.101(166)(c). Thus, under both the Handbook and rule 59G-1.101(166), the medical necessity determination requires a separate analysis under which, even if a client is eligible for a given level of service— *719 here, IBRH — APD must yet determine whether service at that level is medically necessary before the service may be authorized, or reauthorized, and be paid for by Medicaid. The six conditions for transitioning an IBRH recipient to less intensive service levels may be relevant to APD’s decision on reauthorizing IBRH treatment for that recipient. But, contrary to the ALJ’s conclusion, nothing in the Handbook requires continued IBRH treatment — deeming it medically necessary — unless the recipient satisfies all conditions for transition to a less intensive treatment. APD may properly conclude that continued IBRH is not medically necessary for a client even though the six transition conditions are not met. APD has appropriately relied on the rules governing medical necessity determinations and service authorizations — rule 59G-1.010(166) and the Handbook — in making its reauthorization decisions.

III. Conclusion

Appellees failed to establish that APD transitioned IBRH clients to less intensive services based on an unadopted rule. Because the Handbook expressly conditions authorization of IBRH services on the existence of one or more specified recipient characteristics, APD did not rely on an unadopted rule in denying continued authorization for IBRH for DD Waiver clients who no longer exhibited such characteristics. Furthermore, medical necessity, as defined in rule 59G-1.101(166)(c) and as specified in the Handbook, is the penultimate determination APD must make before Medicaid will pay for any DD Waiver service. Nothing in the Handbook precludes APD from determining that IBRH is no longer medically necessary for an individual client, even though the transition conditions under which a service provider must recommend less intensive treatment are not fully met. A client who disagrees with the reduction in services for lack of medical necessity may require APD to fully explicate its decision in a fair hearing, where the client also may produce evidence challenging the decision. See Fla. Admin. Code R. 65-2.042-2.044, 65G-3.003(5). For these reasons, we REVERSE the amended final order insofar as it sustains Appellees’ unadopted rule challenge. In all other respects, the order is AFFIRMED.
AFFIRMED, in part; REVERSED, in part.
THOMAS and SWANSON, JJ„ concur.

. See § 120.56(4), Fla. Stat. Appellees also challenged certain existing rules as vague and lacking adequate standards for agency decision making. That rule challenge was not sustained, and is not at issue in this appeal.

. Handbook at 1-1; see §§ 393.066, 393.0661, 408.302(1), Fla. Stat.

. Id. at 2-4; see 42 C.F.R. § 440.20(2)(d) (2011) (providing that the state Medicaid agency "may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures”).

. Handbook at 2-4.

. Id.; see Fla. Admin. Code R. 65-2.042-2.044.

. The Agency for Healthcare Administration is the state Medicaid agency.

. Handbook at 2-67.

. Id. at 2-66. Under the heading, "Purpose of This Handbook” is the following statement: "This handbook is intended for use by eligible providers who furnish DD waiver services to recipients enrolled in the waiver.” Id. at 1-9 (emphasis added).

. Id. at 2-64 (emphasis added).

. Id.

. Id. at 2-65.

. Id. at 2-67 (emphasis added).

. Id. at 2-67 — 2-68.

. Id. at 2-64.

. Handbook at 2-68. As we read the Handbook provisions concerning IBRH, we conclude the transition conditions are to ensure that service providers maintain an eye toward reducing treatment intensity and reintegrating clients into society-the stated goal of IBRH treatment.

.Handbook at 2-4.